John C. MACKALL and Marion H. Mackall

v.

UNITED STATES of America.

Mildred P. PICKETT

v.

UNITED STATES of America.

Civ. Nos. 1366, 1304.

United States District Court
E. D. Virginia,
Alexandria Division.

Aug. 5, 1957.

may be established on the Republic, as well as all natural persons within the national territory."

3. Para. 5 of libel.

W. L. Zimmer, III, Richmond, Va., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., A. Andrew Giangreco, Asst. U. S. Atty., Alexandria, Va., for defendant.

PAUL, District Judge.

These are actions for the recovery of amounts alleged to have been illegally collected as income taxes. Since both cases rest on substantially the same state of facts and are to be determined by the same principles of law they have, by agreement, been tried together. In each case the tax years involved were 1948 and 1949 and the sole issue is whether income arising from the sales of certain real estate in those years was properly taxable as capital gains or as ordinary income.

The facts leading to the controversy are substantially as follows:

Prior to 1943 there was in existence a corporation by the name of Langley Land Company, which had originally been formed to hold title to about 700 acres of land which had been owned by the Mackall family for several generations and which had subsequently added other lands to the tract by purchase. In 1943 the tract owned by the corporation consisted of about 1,200 acres in Fairfax County, Virginia; and the stock in the corporation was owned in part by Douglass S. Mackall, Sr. and in part by the heirs of his deceased brother.

In 1943 Douglass S. Mackall, Sr., died and his stock in the corporation was inherited by his two sons, John C. Mackall and Douglass S. Mackall, Jr. These two brothers, finding themselves under the necessity of raising a considerable sum to pay taxes and other costs against their father's estate, consulted their cousins (who owned the rest of the stock) as to some way to liquidate their holdings. It was finally agreed to dissolve the corporation and partition the land. This was done with the result that in December, 1944, John C. Mackall and Douglass S. Mackall, Jr., became joint owners of approximately 638 acres of the land theretofore held by Langley Land Company. In the course of satisfying the financial demands against their father's estate they borrowed $35,000 and secured the loan by a deed of trust on a portion of the 638 acres of land. It appears that John C. Mackall and Douglass S. Mackall, Jr., also inherited from their father another small tract of land which is referred to in the evidence as Langley Hills.

John C. Mackall is a lawyer by profession and has never been in the real estate business in any way. At the time of his father's death in 1943 he was in the military service. His brother, Douglass S. Mackall, Jr., was then and had for many years past been engaged in business as a real estate and insurance broker. Douglass S. Mackall, Jr., died in August, 1946, leaving a widow, Mildred P. Mackall, who inherited his interest in the 638 acres of land, and in the small tract later known

as "Langley Hills". Mrs. Mackall, sometime in 1947, remarried and under her present name of Mildred P. Pickett is plaintiff in one of these cases.

The issues in the case arise out of the sale in the years 1948 and 1949 of certain portions of the land owned jointly by John C. Mackall and Mrs. Pickett. The question is whether the income from such sales was taxable as capital gains, as the taxpayer contends, or as ordinary income derived in the course of trade or business, as determined by the Commissioner of Internal Revenue.

Following the death of Douglass Mackall, Jr., his widow and John C. Mackall, neither of whom were in affluent circumstances at the time, turned their attention to disposing of the 638 acres or such part thereof as they could, in order to meet their needs and obligations; there being included in the latter the $35,000 debt secured on a part of the land. They first thought they might dispose of the tract as a whole. Looking to this end and acting upon the advice of friends they employed a surveyor, a Mr. Sunderman, to make a survey and plat showing the general layout of the land. This plat did not contain any such details as division into lots, streets, etc. It is referred to as a "master plan" the purpose of which was to show a prospective purchaser, the possibilities of the property for development. The owners of the property then consulted the firm of McCay & McCay, real estate brokers, the members of which had had friendly business relations with Douglass Mackall, Jr., during the latter's lifetime. McCay & McCay offered to make an attempt to sell the property as a whole and a copy of the "master plan" was furnished them for aid in this effort.

Sometime later McCay & McCay advised Mr. Mackall that there appeared no possibility of selling the tract as a whole or in large parcels and that the only thing to do was to make a sub-division of the land or a portion of it and sell it off in lots. Accordingly, with the advice and assistance of McCay & McCay, a portion of the tract was platted as a sub-division known as Langley Forest and consisting of approximately 90 acres. McCay & McCay practically took over the development of the sub-division. They suggested the location of roads and streets and how the division into lots should be made. They negotiated with the surveyors who laid out the street and lot lines and with the contractors who built the streets and did other construction work on the property and they supervised the work done. The cost of these improvements was paid by the landowners, but only following the receipt of bids for the work submitted to and approved by McCay & McCay.

An agreement was entered into between McCay & McCay and the owners of the land relative to the sale of the property. This was in the form of a letter, dated November 13, 1947, from McCay to John C. Mackall and Mrs. Pickett in which the former requested the exclusive agency for sale of the land until July 1, 1948, and in which it was set out that McCay & McCay would undertake the advertising of the property in various ways, would supervise any work of improvement to be done on the property, would fix prices on the lots, subject to approval of the owners, and would, in every way, promote the sale of the property. This proposal was accepted by Mr. Mackall and Mrs. Pickett. It appears that the exclusive agency granted McCay & McCay was continued through the years 1948 and 1949 under the same conditions.

During 1948 eighteen lots of varying sizes were sold in the Langley Forest subdivision, and in 1949 twelve such lots were sold. All of these sales were made through McCay & McCay and that firm received commissions on each sale. It is the income derived by John C. Mackall, and Mrs. Pickett from these sales in 1948 and 1949 with which we are now concerned. The taxpayers returned this income as being long term capital gains. The Commissioner of Internal Revenue determined their gains from the sale of these lots to be taxable as ordinary income on the theory that the property was held by the taxpayers for sale in the ordinary course of their business. The result was the assessment of deficiencies

against the taxpayers with interest which were duly paid and which the taxpayers now seek to recover. The amounts involved and sought to be recovered are, in the case of John C. Mackall (and Marion H. Mackall, his wife with whom he filed joint returns) $1,451.37 for the year 1948 and $563.71 for the year 1949, with interest on both sums from November 26, 1952; in the case of Mildred P. Pickett $2,326.45 for the year 1948 and $687.95 for 1949, with interest from December 8, 1952.

It appears that in 1950, 1951 and 1952 other sales of lots were made in Langley Forest and that further portions of the tract owned by these taxpayers were subdivided and sales made therein. The income derived from these sales is not involved here but the fact is noted because of the insistence by the defendant that it indicates the merit of its contention that the property was held for sale in the ordinary course of business. It appears that approximately 200 acres in all was sub-divided into lots and that the taxpayers finally divided the remaining area of around 400 acres between themselves and that the resulting shares of about 200 acres each were sold by them individually as a whole and to different purchasers.

The pertinent provisions of the law are set out in Sect. 117(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117 (a) (1), defining capital assets, as follows:

> "(1) Capital assets—The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *".

On the facts shown by the evidence in these cases I am of opinion that the property involved here was not held by these taxpayers primarily for sale in the course of their trade or business, but that it was a capital asset, the income from the sale of which was taxable as a capital gain.

What we have here is the situation where two persons inherited a rather large tract of unoccupied and unimproved land, which, because of some pressing debts and their personal needs, they felt it desirable to dispose of. They first attempted to sell the land as a whole. When this effort proved unsuccessful they, acting upon the advice of the real estate agent to whom they had entrusted the selling of the property, decided to sub-divide a portion of the tract to be sold as building lots. This decision was carried out and with sufficient success to enable the owners of the land to realize substantial amounts from the sale of lots during the years now in question and in several subsequent years.

It is certainly true that a person who owns a piece of real estate (or other property), which by the definition of the statute is a "capital asset", which he wishes to dispose of has a right to do so under conditions which will realize for him the greatest financial benefit. He is not compelled to sell it at once or as a whole. He may sell it off in parcels and over a period of time and he may expend money in improving the property in order to enhance its value and make it more attractive to potential purchasers. And such manner of disposition does not in itself change the nature of the property from a "capital asset" to something else. It is only when property is held primarily for sale in the ordinary course of the taxpayer's business that it loses its character as a capital asset.

The evidence here is to the effect that these taxpayers were attempting to do nothing more than to dispose of the land which they had inherited. One of the owners was a lawyer by profession; the other a widow whose circumstances were not affluent. They consulted a firm of real estate brokers and turned the sale of the property over to them (McCay & McCay). Aside from bearing the expense of sub-dividing the property and improving it and executing the deeds to such lots as were sold the taxpayers had

little, if anything, to do with the property after engaging McCay & McCay to handle it. All sales were made by McCay & McCay. In those cases where prospective purchasers approached either of the taxpayers with inquiries about lots they were referred to McCay & McCay. Neither of the taxpayers ever negotiated, or attempted to negotiate a sale of any of the lots. They received no commissions on any sales made and their only return was in the amounts they received as owners after payment of such amounts as they had agreed to pay to McCay & McCay for the latter's services. At no time did they, by purchase or otherwise, acquire any additional property for sale. They were not in the business of selling real estate. They were attempting to dispose of some property which they had inherited and, under the advice and through the efforts of qualified real estate brokers, they were trying to dispose of the property in such manner and under such conditions as was most advantageous to them.

As heretofore noted, John C. Mackall was a lawyer by profession and in his tax returns stated that as his occupation. At no time in his life has he ever held a license as a real estate broker. During the years in question he was in bad health and spent the larger part of the year 1948 and a considerable part of 1949 either in Florida or in Lancaster County, Virginia, where he had a home. His income from his profession was quite small, amounting in 1948 to $1,118.-51 and to $816.79 in 1949. These receipts he returned as ordinary income.

Some confusion has been thrown into the case by evidence that, following the death in 1946 of her husband, Douglass Mackall, Jr., who had been in the real estate and insurance business, Mrs. Pickett (then Mrs. Mackall) took out licenses as a real estate broker and an insurance broker in an effort to continue her deceased husband's business, which was her only means of livelihood. But it is clear that her activities as a real estate broker had no relationship to the sale of the property here in question. She never sold or attempted to sell any of the Langley Forest property. Her activities as a real estate broker were, in fact, quite limited. In the two or three years following her husband's death she negotiated two or three sales of property for people with whom she had a personal relationship and she received some commissions on transactions which had been initiated by her husband prior to his death. In these years she also received some commissions from Travelers Insurance Company on insurance written. Her total income from her activities in the real estate and insurance business amounted to $2,445.40 in 1948 and to $1,-527.38 in 1949, and these amounts were shown on her tax returns and taxed as ordinary income.

Counsel for the Government emphasize the fact that the income received by each of these taxpayers in the years 1948 and 1949 from the sale of their real estate was greatly in excess of that received from other sources. Undoubtedly this is true, but that fact does not prove or necessarily suggest that the property was disposed of in the ordinary course of business. When they inherited the property both of these taxpayers were in straightened circumstances and with insufficient income to meet their obligations and maintain their households. It was this which inspired them to sell the property. They are not the first persons who have found it necessary to spend their capital in order to live. There have been many cases of persons who, either from necessity or from lack of wisdom and industry, have at times derived a large part or all of their income by disposing of their capital assets.

The facts in this case are such as in my opinion to bring it clearly within the authority of Camp v. Murray, 4 Cir., 226 F.2d 931, and Smith v. Dunn, 5 Cir., 224 F.2d 353, the latter of which is cited with approval in the former. The facts in the instant case, with the exception of minor and immaterial details, are quite similar to those in the cases referred to and particularly to those in Smith v. Dunn. Without prolonging this

discussion by quotations from the opinions in those cases it is sufficient to say that much that is said in them is strikingly applicable to the instant case. Cases such as this turn upon their own peculiar facts (as do most cases), and I am of opinion from the facts disclosed here that the proceeds of the sale of the real estate involved here were taxable as capital gains and that the Commissioner was in error in ruling to the contrary. The plaintiffs are entitled to recover the respective amounts sued for, and counsel are directed to tender for entry the appropriate judgment orders.