GEORGE W. LONGFELLOW AND RUTH LONGFELLOW, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60054.    Filed October 9, 1958.

*Don O. Russell, Esq.*, for the petitioners.
*Towner S. Leeper, Esq.*, for the respondent.

## OPINION.

MURDOCK, *Judge:* George was asked on direct examination "how did this piece of property fit into your business" and he replied, "I needed space to keep my equipment." He then referred to equipment which he had at the time he was testifying on December 7, 1956, saying that he had about 20 pieces of heavy equipment scattered all over Illinois which he left sitting out all of the time because he wouldn't be able to get it on his own property. George testified that he had an outlet on the north end of the 21-acre property to a public street through 2 lots which he owned in an adjoining subdivision, only a small amount of grading would be required there and he intended to build a home there with some sheds large enough to accommodate working space for repair and storage of "this machinery," referring to the 20 pieces which he said he had in December 1956. He also testified that in 1943 and for the duration of the war, the heavy equipment which he was using consisted of only 3 tractors and scrapers and 2 old cranes. The 21 acres were in a strictly residential zone. George never built any house or sheds on the property or used it as a residence or in connection with his contracting business. He testified that he didn't build because of a ban on building during the war and because costs were too high. He decided to sell the property prior to putting a "For Sale" sign on it about 1947. George, at all times material hereto and at least since 1936, lived in his residence in Alton. A plan for subdividing the 21-acre tract had been made previously but it is not clear from the record whether

George knew of this plan at the time he bought it. He was not asked while on the stand whether he had any intention or thought of grading, subdividing, and selling the 21 acres in lots when he bought it in 1943. George's testimony as a whole does not prove convincingly that he might not have had such a thought in mind at the time he purchased the tract.

However, regardless of what his original purpose might have been or of what he might have had in mind when he bought it, his purpose could change and it is clear that he decided not later than the summer of 1951 to grade, subdivide, and sell the entire tract in lots in order to make profits, not just to liquidate an investment. It cost him over seven times the cost of the bare land to improve it, yet he wants his original investment to control the whole activity so that not only any gain from the holding of the bare land, but also the gain resulting from the improvements, would receive capital gains treatment. Cf. *Shearer* v. *Smyth*, 116 F. Supp. 230, affirmed per curiam 221 F. 2d 478, certiorari denied 350 U. S. 840. Actually, what he sold was not the bare land which he had held for a number of years but a product which he created out of that bare land by his own efforts and the investment of $56,786.84 of his own money.

He was not a real estate agent but he made a business of developing this tract of over 21 acres as a subdivision and selling it off at retail as lots. He did that in order to make profits, not from the land alone, but from his own services and the use and risk of his own funds in creating a product which he could sell for a greater profit than any profit which he might have realized from a liquidation of his small investment in the land alone. He entered into a business when he started to improve, subdivide, and sell the lots. He bore the entire risk of the costly venture. He engaged help for that part of the business which he cared to entrust to others. Maurice did not buy the tract or act as principal in connection with it, he merely helped with the platting and subdividing and then received as his only compensation a commission of $100 for each lot that he was able to sell. The activities of Maurice in selling the land, that is, whatever advertising he did and the other efforts which he made to find purchasers, must all be regarded as done in George's behalf and as part of the business which he was carrying on with the aid of Maurice whom George paid for services rendered by him.

George was in charge of this business and made all of the important decisions. He decided to enter into the plan in the first place. He brought water lines to the tract at his own expense before Maurice talked to him. He decided later to use the services of Maurice and engaged him on a regular continuing basis. He decided to have the tract platted, surveyed, and the lots and streets marked off. He did

the grading and shaping of the streets through his own corporation and at his own expense. He put in curbs and gutters at places to make the lots more readily salable. He fixed the prices of the lots. He paid his selling agent a commission. He retained control over the type and size of the houses to be built and he executed the deeds to the lots only when all of the purchase price had been paid. George was active in the business at all times.

Sales were continuous over a period of years. They were frequent enough and substantial enough to constitute a business activity. The income from them was a substantial part in each year of the total income reported. George was making a profit on the sales which took place during the taxable years of about 100 per cent on his total investment. The evidence indicates that only a small part of that profit could be attributed to any possible increase in the value of the bare land as opposed to the portion of the sales price and profit attributable to the work which George did in grading, subdividing, and improving the bare land.

Each case of this kind must be decided on its own facts. *Mauldin* v. *Commissioner*, 195 F. 2d 714, affirming 16 T. C. 698; *Gamble* v. *Commissioner*, 242 F. 2d 586. No decided case duplicates the facts of this one. No advantage would be gained by comparing the facts in this with those in other decided cases, regardless of the results reached in those cases. The law and facts here justify the conclusion that George did actively engage in business in order to sell these lots and to treat his gain as ordinary income.[1]

The Judge who heard the witnesses in this case participated in the several conferences of the Court when it was considered and the Court has had the full benefit of his views on the evidence.

Reviewed by the Court.

*Decision will be entered for the respondent.*

PIERCE, *J.*, dissenting: I, who was the trial Judge in this case and am the only member of the Court who has seen and heard the witnesses, respectfully dissent from the foregoing report. I would have decided the issue in favor of the petitioners. I entirely disagree with the summary conclusions set forth in the final paragraph of said report, which read:

No decided case duplicates the facts of this one. No advantage would be gained by comparing the facts in this with those in other decided cases, regardless of the results reached in those cases. * * *

I think the present case is not unique, either as to its facts or as to the issue presented; and I believe that such disregard of the numerous

---

[1] The case of *Allen Moore*, 30 T. C. 1306 (1958) adopted by the Court at the same conference at which this case was adopted, is believed to be distinguishable on its facts.

decided cases which have dealt with the same general problem, is unjustified.

1. In the first place, I think that the issue should have been more clearly and specifically defined. Basically, it is this:

Where the petitioner, for the purpose of liquidating a single 21-acre tract of unimproved realty which he had held for more than 8 years as a "capital asset," caused the property to be subdivided and sold as residential lots by an independent realtor, and where in connection therewith he assumed and paid such costs for grading, interior streets, and water supply as were necessary to make the lots accessible and marketable, did such action put the petitioner into the ordinary course of a real estate business within the meaning of section 117 (a) (1) (A) of the 1939 Code, and thereby deprive him of the benefit of capital gains treatment on the gains derived from the sale of the lots?

Similar issues have arisen frequently, where due to the growth and expansion of cities or villages, the highest and best use for outlying properties, which theretofore may have been used for agricultural purposes, or which because of their rocky, hilly, or swampy character may have been allowed to remain idle, has been changed to potential residence sites; and owners of such properties, either because they had no further use for the properties or because they desired to realize on the resulting appreciation in value, have subdivided and sold their holdings as residence lots, rather than as undivided acreage.

Such problem, which requires an interpretation of the provisions of said section 117 (a) (1) (A) relating to the carrying-on of the ordinary course of a real estate business, has been considered and dealt with in numerous decided cases, many hereinafter cited, by several of the Courts of Appeals, the Court of Claims, and various District Courts. Some of these cases are very recent; and some constitute reversals of decisions of this Court.

2. Many of the findings and conclusions of fact contained in the above report do not, in my opinion, reflect the true situation presented by the evidence. This is particularly true of various conclusions of fact set forth in the opinion portion of said report, pertaining to the circumstances and the motives of the petitioner, which prompted him to subdivide the property; which pertain to the nature of the relationship that existed between petitioner and the independent realtor who handled the subdividing and sales; and which pertain to the extent of the petitioner's personal services in connection with the matter.

Based on my personal observation of the witnesses, I regard all of the testimony to be credible.

I would have found the material facts to be as follows:

The petitioner, George W. Longfellow, who resides in Alton, Illinois, has at all times since 1936 been engaged in the business of grad-

ing, earth moving, and similar heavy construction work. Since 1948 he has operated through a corporation bearing his name, which at the time of the trial was handling a heavy construction contract for the United States Government. He has never been licensed to act as a real estate dealer, or had a real estate office, or advertised or otherwise held himself out as being in the real estate business. Except in connection with the particular tract involved, he has never had any part in any real estate subdivision. And miscellaneous realty sold by him in the taxable years involved, including a farm and three lots, was treated by the respondent as not having been held for sale in the real estate business.

In the latter part of 1942 or the spring of 1943, a local realtor came to see petitioner and requested him to make an offer for the tract here involved, called Turner Acres, which the then owners were under pressure to liquidate. This tract, which contained about 21 acres, was located in the country about 1¼ miles outside the city limits of Alton. Except for about 7 acres in the northwest corner, which were relatively level and adjacent to the principal access road to the north, the tract was of exceedingly rough terrain; was traversed by steep-sided ravines and a hogback that ran diagonally through it and had a height up to 30 or 40 feet; and was covered by trees, many having a large diameter. None of the tract was improved or income-producing; and, in its then existing condition, it was not suitable for either farming or subdivision.

Petitioner, after some hesitancy, made an offer of $7,000 for the entire tract, which was accepted; and on May 3, 1943, he and his wife took title in joint tenancy, at a total cost of $7,750. Their intention, at the time, was to use the level portion at the northwest corner as a site for erecting a new residence for themselves and also for erecting machinery sheds to replace those near petitioner's residence in Alton, which he was then using. Such improvements were at first deferred because of existing restrictions on building materials, and later because of increased building costs; and thereafter, the plan to make such improvements was abandoned. The tract thus remained in the hands of petitioner and his wife, totally unused and non-income-producing.

In about 1947, petitioner concluded that he had no use for the tract, and decided to get rid of it; and he placed a large "For Sale" sign upon it. This produced no offers. Subsequently in about 1948, a company offered to buy the entire tract for $35,000, but only on condition that petitioner would grade it at his own expense. Petitioner estimated that such grading would cost approximately $24,000, and he rejected the offer. Also, in 1950, the county school district offered to buy the level 7-acre portion at the northwest corner, for $17,000; but the sale of this portion would have cut off the remaining 14 acres from the principal access road and from the city water which had been extended

to the property line at said point; and would have left such portion unusable. Thus, this offer also was rejected; and the entire tract continued to remain, as before, unused and non-income-producing.

During the war and by 1951, the so-called Milton area near Alton, in which Turner Acres was located, enjoyed increasing use for residential sites. Subdivisions had been developed by other parties, on three sides of the tract; a considerable number of houses had been built; and there was need for additional schools and building sites.

In the spring of 1951, a professional subdivider named Wickenhauser came to petitioner's home, and said that he could dispose of the tract for petitioner, by subdividing and selling it for building sites to professional house builders with whom he had contact, if petitioner would first grade the property at his own expense and assume such miscellaneous costs as those for surveying and bringing in the city water. Petitioner replied that he would be willing to do this only if it would result in his liquidation of the entire tract. Wickenhauser thereupon assured petitioner that this could be done; brought to petitioner's home one of the builders, named Ladd, who agreed to buy at least 10 building sites; and told petitioner that he knew a number of other builders who likewise would be willing to buy sites. Petitioner then decided to proceed with the suggested plan.

Petitioner completed the grading of the entire tract in a period of about 3 or 4 months in the fall of 1951, using for such purpose the services of his construction corporation, for which he personally made payment. Thereafter, Wickenhauser, operating through his own company known as the Maurice J. Wickenhauser Agency, laid out the subdivision; had the plat approved by the public authorities; staked out the lots; placed "For Sale" signs on the properties, which carried the name of his agency and made no mention of petitioner; solicited and showed the lots to builders and other potential purchasers, and passed on their financial ratings; and otherwise handled the sales. Wickenhauser caused about two-thirds of the 21 acres to be platted in the year 1951, and the balance in 1954 which was subsequent to the years here involved. He received a commission of $100 on each lot sold.

The expenses of the subdividing, except for the grading which cost $24,950, were relatively low. These expenses, which have been stipulated, included nothing for paving, sidewalks, sewers, landscaping, or utilities other than water. A few curbs were installed where it was necessary to control drainage. Petitioner did not build any houses. Aside from arranging for the grading and paying the miscellaneous expenses, he did practically nothing other than to execute contracts or deeds which Wickenhauser and his salesmen submitted.

The sales prices of the lots ranged from $1,350 to about $1,500; and petitioner's net gain per lot, as determined by the respondent with

respect to the 1943 cost of the tract plus improvements and selling expenses, averaged about $670.

Most of the lots sold were purchased by professional house builders with whom Wickenhauser had contact. Four lots were sold in the year 1951—all to one purchaser who was the builder, Ladd, who had agreed prior to the beginning of the subdivision work to purchase at least 10 sites. In each of the years 1952 and 1953, which are the other 2 years here involved, 16 lots were sold. But out of the total of 36 lots sold in all 3 taxable years, 29 were sold to Ladd and four other professional builders. In the following years not here involved, other lots were sold as the builders continued their construction activities; and some lots were still being sold at the time of the trial. However, the taxation of any gains realized in such later years is controlled by the new provisions of section 1237 of the 1954 Code, and is not before us.

3. The holding of the majority report is, in my opinion, out of line with the weight of judicial authority, and also out of line with the recent trend of decided cases which have dealt with the general problem involved.

One of the most recent of these cases is that of the Court of Appeals for the Sixth Circuit, *Yunker* v. *Commissioner*, 256 F. 2d 130 (1958), reversing the decision of this Court at 26 T. C. 161. The Court of Appeals' opinion contains an extensive review of many authorities in the area, and states in part:

With respect to the interpretation of the statute, the words and phrases "trade or business," "ordinary" and "customers" are to be construed in their ordinary and not in an artificially created meaning. *Higgins* v. *Commissioner*, 312 U. S. 212. To be engaged in the real estate business means to be engaged in that business "in the sense that term usually implies." *Dillon* v. *Commissioner*, 213 Fed. (2d) 218, 220 (C. A. 8). * * *

Where a taxpayer liquidates his real estate holdings in an orderly and businesslike manner, [by a series of sales, in smaller parcels] he is not by that circumstance held to have entered into the conduct of a business. * * *

 *       *       *       *       *       *       *

If petitioner had sold the entire tract at a profit, in one transaction, it is unquestioned that she would be entitled to capital gains treatment. It was impossible for her to sell the entire tract at one time at a profit. To hold that she would not be entitled to capital gains treatment, when she would otherwise be entitled to it, merely because she selected the only possible method of selling her property at a profit, by installing improvements and selling in smaller parcels, would seem to be an injustice resulting from a forced and artificial construction of the statute, which, in our view, could not have been intended by Congress.

The Court of Appeals for the Seventh Circuit, which is the court that presumably would have jurisdiction of any appeal from the decision in the instant case, has given effect to similar principles, in two cases: *Chandler* v. *United States*, 226 F. 2d 403 (1955); and *Three States Lumber Co.* v. *Commissioner*, 158 F. 2d 61 (1946), reversing a Memorandum Opinion of this Court. In each of these cases, the

Court of Appeals appears to have recognized the principle that, even though in the circumstances a large number of parcels may be sold and the expenses incurred may be substantial, these factors are not sufficient to put the taxpayer-seller into the ordinary course of a real estate business within the meaning of the controlling statute, if they are incidental and appropriate to his primary purpose of liquidating the capital asset involved. In the *Chandler* case, the court said in part:

Of course, it is abundantly clear that this taxpayer started with a capital asset. Resort to dictionary definitions of such words as "ordinary," "trade" and "business," as expected, are little aid here. Nor can any workable formula be developed which will show what quantum of commercial activity equals "business." Moreover, "liquidation" is, also, devoid of any magical meaning. Here the taxpayer desired to replace acreage with cash. The lands were not purchased in one market for the purpose of selling holdings in another. * * *

Defendant would insist that Capitol [the taxpayer] sit idle, wishing for a buyer or buyers, under the threat that any selling effort would result in deprivation of capital asset treatment. Despite the blurring, in relevant precedent, between capital gain and ordinary income we think the specific facts established in this case warrant capital gain treatment for taxpayer's transactions. * * *

The Fifth Circuit likewise has allowed capital gains treatment in several cases dealing with the problem: *Smith* v. *Dunn*, 224 F. 2d 353 (1955); *Fahs* v. *Crawford*, 161 F. 2d 315 (1947); *Consolidated Naval Stores Co.* v. *Fahs*, 227 F. 2d 923 (1955); and *Ross* v. *Commissioner*, 227 F. 2d 265 (1955), reversing a Memorandum Opinion of this Court. In the *Smith* case, the court said in part:

The court below seems to have had the idea that any taxpayer who seeks to make a better sale of a capital asset consisting of land forfeits the right to claim profits as capital gain by the mere fact of subdividing and seeking out purchasers, even though he does this by a regular real estate broker acting in the capacity we have described. We rejected that concept in Fahs v. Crawford, supra, [161 F. 2d 315] * * *

Also in said *Crawford* case, the Fifth Circuit said in part:

In effect, what the taxpayer was doing [by installing water, lights, and paving] was to render more attractive a capital asset already owned, in order to sell it, in much the same way as an owner would paint and redecorate an old house, and landscape the grounds, in order that his broker could more readily dispose of it for him. These activities were but preliminaries. * * *

The Court of Appeals for the Second Circuit dealt with the problem in *Phipps* v. *Commissioner*, 54 F. 2d 469, modifying 12 B. T. A. 1293. There, in an opinion written by Judge Augustus N. Hand, the court allowed capital gains treatment to the taxpayers, notwithstanding that property was subdivided into about 70 lots and substantial improvements were installed; pointed out that after the property had been so improved, nothing remained to be done by the taxpayers except to receive offers submitted by their brokers; and held that the taxpayers'

"supervision of their own investments" could not be said to be a "trade" or "business."

The Court of Claims, in the recent case of *Gordon* v. *United States*, 159 F. Supp. 360 (1958), allowed capital gains treatment to gains derived from sales of subdivision lots, and placed emphasis on the fact that:

in conducting the liquidation program, [the taxpayers] entrusted the disposition of the property to an independent real estate broker and did not themselves take an active part in the sales campaign, * * *

Recent District Court cases to the same general effect, include: *Mackall* v. *United States*, 162 F. Supp. 522 (E. D. Va., 1957); *Berberovich* v. *Menninger*, 147 F. Supp. 890 (E. D. Mich., 1957); *Schumacher* v. *United States*, —— F. Supp. —— (S. D. Texas, Mar. 18, 1958). See also *Powers* v. *United States*, —— F. Supp. —— (S. D. Ill., June 11, 1958).

Applying the principles thus enunciated in the foregoing cases to the evidence in the instant case, I would have held: That the 21-acre tract here involved started out as a capital asset; that subdivision of said tract was incidental, necessary, and appropriate to petitioner's liquidation of the same; that the cost of the preliminary grading and the other miscellaneous expenses were no more than was necessary and appropriate to bring the extremely rough tract into line with adjacent properties, and to make it accessible and marketable for sale, either by subdivision or otherwise; that practically all subdivision and sales work was performed by the independent realtor; and that none of the foregoing was sufficient to put petitioner, who had never engaged in the real estate business, into the ordinary course of such a business within the meaning of section 117 (a) (1) (A) of the 1939 Code.