William R. Atteberry v. Commissioner.
Atteberry v. Commissioner
Docket No. 76144.
United States Tax Court
T.C. Memo 1961-158; 1961 Tax Ct. Memo LEXIS 190; 20 T.C.M. (CCH) 791; T.C.M. (RIA) 61158; May 31, 1961
*190 In 1943, petitioner, a heavy construction contractor, acquired, by purchase, a 61-acre tract of rough, unimproved land as an investment. In 1954, petitioner subdivided 20 acres of the land into 51 residential building lots. In 1955 and 1956, petitioner sold the 51 lots in two sales of 6 and 45 lots, respectively. Held, petitioner did not hold the lots primarily for sale to customers in the ordinary course of his trade or business and the gains realized from the sale thereof are taxable as gains from the sale of capital assets. Oldham Clarke, Esq., Kentucky Home Life Bldg., Louisville, Ky., for the petitioner. Hubert E. Kelly, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income taxes of the petitioner for the years 1955 and 1956 in the respective amounts of $1,527.47 and $34,376.95. The single issue for decision is whether gains realized by petitioner in 1955 and 1956 from the sale of certain building lots are taxable as gains from the sale of capital assets or as ordinary income from the sale of property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. *191 Other issues raised by the pleadings relating to petitioner's basis in the lots sold and whether petitioner is taxable on the basis of individual or joint returns have been eliminated by stipulation of the parties. Findings of Fact The stipulated facts are so found. Petitioner is an individual who resides at 4761 Dixie Highway, Louisville, Jefferson County, Kentucky. He is a native of Louisville and received his primary and secondary education there. Subsequently, he attended the University of Miami, Miami, Florida. From 1943 to 1946, petitioner served as a captain in the Corps of Engineers of the United States Army. Since his discharge from the Army in 1946, petitioner has been employed by various companies in sewer construction work and has engaged in general sewer and pipe line construction work as a sole proprietorship. At present, he operates a retail store on Dixie Highway, Jefferson County, Kentucky, where he sells plywood, doors and paint. In December 1943, petitioner purchased 61 acres of rough, unimproved land located in the vicinity of Dixie Highway and what is now Gagel Avenue, Jefferson County, Kentucky (hereinafter referred to as the Gagel Avenue property) for $5,000. *192 Gagel Avenue was built through this property by Jefferson County in 1944 and 1945, and approximately bisects the property on an east-west line. Since May 10, 1943, the Gagel Avenue property has been zoned by the Jefferson County Planning and Zoning Commission as a "One-Family Residential" district. From the time petitioner acquired the Gagel Avenue property until some time in 1954, except for the sale of 8 small parcels noted below, it had lain idle and had not been used by the petitioner, nor had any attempts been made by him to use it, for income-producing activities. The property was covered by trees and dense undergrowth. In 1948 and 1949, petitioner sold portions of the Gagel Avenue property as follows: Size of Lot
Date
Sales
Purchaser
or Parcel Sold
of Deed
Price
W. F. Compton
1 acre
5/22/48
$1,000
A. A. Judith
1.6 acre parcel
7/ 3/48
2,000
Jacob Kemp
150feet X 175feet lot
12/ 9/48
2,500
G. P. Hammer
75feet X 175feet lot
8/22/49
500
R. B. Hammer
75feet X 175feet lot
8/22/49
500
E. M. Hicks
75feet X 175feet lot
8/22/49
500
M. W. Kelly
150feet X 175feet lot
8/22/49
1,000
K. T. Fenster
75feet X 175feet lot
8/22/49
500
In 1954, petitioner subdivided a portion of the Gagel Avenue property and had 20 acres thereof platted *193 into 51 lots. The plat was approved by the Louisville and Jefferson County Planning and Zoning Commission on April 29, 1954. The plat was recorded on January 18, 1955, and the area embraced therein was labeled "Atteberry Subdivision" and will hereinafter be referred to by that name. The plat was submitted to the Federal Housing Administration some time in 1954, together with plans and specifications for houses to be constructed on the lots and other pertinent data, for approval. Petitioner later abandoned his efforts to obtain FHA approval and such approval was never obtained by him. Atteberry Subdivision was bounded on the north by Cardinal Court Subdivision; on the east by property belonging to Sam Fey; on the south by a strip of land approximately 175 feet wide fronting on Gagel Avenue; and on the west by the Illinois Central Railroad tracks. It was bisected approximately on an east-west line by Stafford Avenue and on a north-south line by London Drive. The remainder of the Gagel Avenue property (approximately 30 acres) has remained idle and has not been used, nor has any attempt been made to use it, for income-producing activities. This remaining acreage is still covered with trees *194 and underbrush. On November 12, 1954, petitioner secured a $30,000, five percent mortgage loan from the Lincoln Bank and Trust Company in Louisville for the purpose of making improvements to Atteberry Subdivision. The loan was due in one year and was finally paid from the proceeds of the hereinafter described sales. The note evidencing the loan was co-signed by Hughes Lumber Company (hereinafter referred to as Hughes) in consideration of an obligation assumed by petitioner to purchase from Hughes building materials for all houses constructed by petitioner in Atteberry Subdivision. This agreement provided that in the event petitioner was unable to sell his houses, or sold any lot without building a house on it, petitioner was to pay Hughes $50 per lot. This loan was not to be used for building, but only for the purpose of clearing the land and making it suitable for residential building. Control of the funds received by petitioner from the loan was retained by Hughes through a requirement that such funds be kept in a separate account and that all checks written on such funds should be countersigned by an official of Hughes. Hughes caused a complete set of house plans to be drawn up *195 for houses to be built on the lots in Atteberry Subdivision. These plans were submitted by petitioner with the application to the Federal Housing Administration hereinbefore mentioned. In 1954, 1955, and 1956, petitioner made improvements to Atteberry Subdivision such as clearing the land, improving the drainage, cutting, grading and paving Stafford Avenue. Water mains, water lines and gas lines were installed by the Louisville water and gas companies, petitioner doing some of the work as contractor for the water company. No sewers were installed. London Drive was constructed in 1954 at the expense of Whitehurst Builders, Inc., which owned the Cardinal Court subdivision and needed access thereto from Gagel Avenue. Petitioner deeded the necessary right-of-way to Whitehurst and Savage, Inc. Petitioner constructed sidewalks in front of the six lots sold in 1955 and completed Stafford Avenue after the sale of the remaining 45 lots as required by the contract of sale. Petitioner performed some of the clearing and grading work himself in developing Atteberry Subdivision and employed others to build Stafford Avenue and make improvements. A registered engineer was employed by petitioner to *196 do the planning, surveying and establishing of lot lines in Atteberry Subdivision. The recorded plat was prepared by a firm of consulting engineers. A topographical map of the subdivision was prepared showing the contours of the land and petitioner made percolation tests to determine absorption and subsurface drainage characteristics of the land. Petitioner did no advertising whatsoever with regard to the lots. At some undisclosed time in 1955 or 1956, there was a sign or signs at Gagel Avenue and London Drive which contained the words "Atteberry Subdivision." During 1955 and 1956, Hughes kept a plat of Atteberry Subdivision in its place of business to show to contractors who might inquire about the availability of building lots. Hughes was frequently asked by customers about the availability of building lots and considered it good practice to obtain and keep such information for the benefit of its customers. In 1955, an employee of Hughes, a building material salesman working on a commission basis, showed certain lots in Atteberry Subdivision to Raymond R. Webb and Elmer H. Nottingham, who were engaged in the business of building houses for sale as partners under the name Webb and *197 Nottingham. Webb and Nottingham were long time customers of Hughes. On October 4, 1955, Webb and Nottingham purchased 6 lots (Lots 12 through 16 and Lot 25) in Atteberry Subdivision for a total consideration of $12,850. Lots 12 through 16 were purchased at $2,100 each and Lot 25 was purchased at $2,350. The entire purchase price was applied by petitioner to reduce the principal of the aforementioned loan. The deed from petitioner to Webb and Nottingham contained numerous building restrictions and included a provision as follows: (8) Plans of each residence and/or garage and/or fence showing plan, type, size, material and color scheme, and location of same shall be submitted to and approved in writing by W. R. Atteberry or by his agent, Al H. Gruneisen, or by anyone to whom power of approval shall be delegated in writing by W. R. Atteberry, before construction is begun. W. R. Atteberry further reserves the right to transfer and assign this right to approve plans and specifications to a neighborhood committee. Al H. Gruneisen was an official of Hughes. Petitioner and Gruneisen approved all of the house plans used by Webb and Nottingham in the construction of homes in Atteberry Subdivision. *198 On March 6, 1956, petitioner sold the remaining 45 lots in Atteberry Subdivision to Whitehurst Builders, Inc. for $96,700. The terms of the sale were $82,500 cash, with the balance of $14,200 secured by a second mortgage and bearing interest at 6 percent per annum. Petitioner agreed to release to Whitehurst Builders, Inc. any lot upon payment of $350. The contract of sale also provided: It is agreed and understood that the purchaser is to finish sidewalks and drainage according to the Planning and Zoning requirements and specifications and the seller is to complete the street according to the City of Louisville and FHA specifications. It is further understood and agreed that the seller is to complete the street by July 1, 1956, and in the event something should happen and he is unable to finish the street by that time the purchaser of the property may do so and deduct the cost of the completion of the street from the balance due on the second mortgage. * * * The street referred to in the above provision is Stafford Avenue. The deed from petitioner to Whitehurst Builders, Inc., conveying the 45 lots, contained the following provision: W. R. Atteberry of the first part further transfers *199 and assigns to the party of the second part the right to approve plans and specifications of the improvements that may hereafter be erected in Atteberry Subdivision aforesaid. Said right having been reserved in Paragraph 8 of the restrictions set out in deed to Raymond R. Webb, et al., dated October 4, 1955 recorded in Deed Book 3344 Page 3B in the office of the Clerk aforesaid. The petitioner has never had a license to sell real estate, has never held himself out to be a real estate agent or broker, and has never maintained an office for the sale of real estate. No real estate agent represented him or was paid any commissions in the sale of any of the lots mentioned above. Atteberry Subdivision was never listed with any real estate agent. Petitioner continued in his regular occupation, devoting little time to trying to sell lots. He has never been engaged in the business of constructing houses for sale, for others or on his own property. Other than the tract involved, petitioner has never engaged in the purchase and sale of real property. The area in which Atteberry Subdivision is located has been in great demand for the past five or six years for the purpose of constructing residences. *200 In 1956, petitioner paid Hughes $2,250 ( $50 per lot for 45 lots) and was released by Hughes from any further obligation under the agreement mentioned. In 1957, petitioner sold a parcel of property on the northeast corner of Gagel Avenue and London Drive to the Grace Baptist Church. The tract sold was 175 feet in depth and 1,100 feet wide. The sales price was $18,000. Petitioner's gross income, as disclosed on his income tax returns, for the years 1955 and 1956, was as follows: 1955
1956
Gross receipts from contracting business
$ 5,893.52
Gross rental income
372.00
Gross sales price of real estate sold
12,850.00
$96,700.00
Interest income
135.14
Petitioner reported the gains realized from the sale of the 51 lots (6 in 1955 and 45 in 1956) as long-term capital gains. In addition to certain adjustments relating to basis and other matters concerning which the parties have stipulated, respondent determined that the gain derived from the sale of this property (51 lots) represented ordinary income instead of capital gain as reported. The parties have stipulated the basis of petitioner in the 51 lots in Atteberry Subdivision as follows: Cost of
Cost of
Total
Land
Improvements
Cost Basis
6 lots sold in 1955
$ 196.08
$ 3,869.13
$ 4,065.21
45 lots sold in 1956
1,470.58
29,018.99
30,489.57
Total
$1,666.66
$32,888.12
$34,554.78
*201 The 51 lots in Atteberry Subdivision were not held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Petitioner held the lots for more than six months. Opinion The single issue in this case is whether gains realized by petitioner in 1955 and 1956 from the sale of certain residential building lots are taxable as gains from the sale of capital assets or as ordinary income from the sale of property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Respondent has cited section 1221(1) of the Internal Revenue Code of 1954, [1] while petitioner has cited section 1231(b)(1)(B), [2] *202 *203 as the applicable statute. Neither party has made any distinction with respect to the application of these two sections under the facts presented herein. [3] Both parties argue only the question whether the lots were "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The quoted language is identical in both sections. Whether the lots involved were "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" is a question of fact. W. T. Thrift, Sr., 15 T.C. 366. Several well recognized tests have been evolved by the courts in the course of deciding this question. These tests include the purpose or reason for the taxpayer's acquisition *204 of the property and in disposing of it; the continuity of sales or sales related activity over a period of time; the number and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of the sales when compared to other sources of taxpayer's income. James G. Hoover, 32 T.C. 618. No one of these tests can be regarded as determinative, but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case. W. T. Thrift, Sr., supra. We have found as a fact that the lots in question were not held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Petitioner purchased the Gagel Avenue property in December 1943 as an investment. At the time he purchased it, the land was rough, unimproved, and covered with trees and dense undergrowth. It had previously been zoned for use as one-family residential property and has continued to be so zoned to the present time. Until sometime in 1954, except for eight small parcels sold in 1948 and 1949, the property *205 lay idle. During this period petitioner made no attempt to use it for income-producing purposes or to dispose of it. The eight small parcels sold in 1948 and 1949 were sold to individual who sought him out. These sales were totally unsolicited by petitioner and there is no contention herein that they were other than sales of capital assets. The only physical change made in the property prior to 1954, aside from that made by the above purchasers, resulted from the extension of Gagel Avenue by Jefferson County in 1944 and 1945, at which time petitioner was in the military service in Germany. Respondent's argument that petitioner's failure to use the property for income-producing activities demonstrates that he did not purchase it as an investment but that his original intention in acquiring the property "must have been" to subdivide it and sell it off in lots is unwarranted. On the contrary, petitioner's failure to use the property for income-producing activities as well as his failure to subdivide or improve it convinces us that until 1954 at least he was holding the property as an investment with the hope and expectation of making a profit from its appreciation in value. It is recognized *206 that the purpose of acquisition is subject to change and, though to be considered, is not as controlling as the purpose for which the property is held at the time of sale. Raymond Bauschard, 31 T.C. 910, 917, affd. 279 F. 2d 115 (C.A. 6, 1960); George W. Longfellow, 31 T.C. 11, 17; Mauldin v. Commissioner, 195 F. 2d 714, affirming 16 T.C. 698; Dunlap v. Oldham Lumber Co., 178 F. 2d 781. We are satisfied, however, from a consideration of all the evidence herein, that petitioner did not become a dealer in real estate by reason of his subdivision and improvement of the property in question, as contended by respondent, and that he was not holding the lots primarily for sale to customers in the ordinary course of such a trade or business at the time the sales herein were made. As was recently stated in Wellesley A. Ayling, 32 T.C. 704, 709: It has been recognized in many cases that sellers may take reasonable steps to improve their property to make it more readily acceptable without assuming the mantle of a dealer in real estate business or forfeiting the right to capital gains treatment on proceeds of sale. W. T. Thrift, Sr., supra; Allen Moore, 30 T.C. 1306. See also Smith v. Dunn, 224 F. 2d 353, *207 Mackall v. United States, 162 F. Supp. 522; Boomhower v. United States, 74 F. Supp. 997. The present case is distinguishable on the facts from George W. Longfellow, supra, relied upon by respondent. Petitioner purchased the 61-acre tract in 1943, at or about the time he entered the military service, and, except for the small parcels sold in 1948 and 1949, held the property for approximately 11 years, without any effort to improve it, develop it or dispose of it. In 1954 he subdivided 20 acres which he had surveyed and platted into 51 lots with two bisecting streets. In 1954, 1955, and 1956, he cleared the land of trees and undergrowth, improved the drainage, cut, graded and paved Stafford Avenue, and had water mains, water lines and gas lines installed. Sidewalks were constructed in front of 6 lots sold in 1955, and the paving of Stafford Avenue was completed after sale of the 45 lots in 1956 in accordance with the agreement contained in the contract of sale. The other street, London Drive, was constructed by the owner of an adjoining subdivision to which petitioner had deeded the right-of-way in order that it might gain access to Gagel Avenue. The date of this deed is not shown, *208 but presumably was before the streets shown on the plat were dedicated to public use by petitioner. Otherwise there would have been no need for such a deed. Funds with which to make the above improvements were obtained by petitioner on a mortgage loan note endorsed by Hughes Lumber Company, dealers in building materials, and were restricted in use to making the lots suitable for residential construction. Although there was testimony by others that petitioner intended to construct and sell houses on the lots himself, he did not so testify and the evidence does not establish such an intention. Petitioner had no experience in the construction of houses and was obviously without funds with which to finance such a business. Not only was the money obtained on the mortgage loan restricted in use, but the note was payable in one year and the proceeds from the two sales were applied on the note. If petitioner ever entertained the idea of building houses for sale on this property, he abandoned such intention before completing the improvements. Petitioner sold the 51 lots in two sales, one for 6 lots on October 4, 1955, and one for 45 lots on March 6, 1956, within a period of less than six months. *209 Neither of these sales was solicited by petitioner and he paid no commissions to anyone for making them. The first sale resulted from the activities of a salesman for Hughes, interested in earning a commission on the sale of building materials, who showed the lots to Webb and Nottingham, customers of Hughes who were engaged in the business of building houses for sale. The second sale of 45 lots was made to the owner of the adjoining subdivision previously mentioned. Except for the 61-acre tract, petitioner has not engaged in the purchase and sale of any other real property. As of the date of the hearing herein, he still owned the remaining portion amounting to 30 acres or more of the original 61-acre tract. Petitioner has never had a license to sell real estate, and has not held himself out to be a real estate agent or broker. Not only has he not maintained an office for the sale of real estate, but, he testified he did not maintain an office in connection with the improvements mentioned. The Atteberry Subdivision was never listed for sale with any real estate agent and petitioner did not advertise the lots for sale in any manner. Although there were one or two signs at the intersection *210 of Gagel Avenue and London Drive in 1955 or 1956, which bore the words "Atteberry Subdivision," no witness could recall that they bore any advertising of lots for sale. Hughes kept a copy of the plat of Atteberry Subdivision in its office and showed it to contractors inquiring about available building sites, primarily for its own benefit. Hughes was in the business of selling building materials and considered it good business practice to furnish such information to its customers. Being surety on the mortgage loan notes, it was entitled to have a copy of the plat. The improvements made by petitioner were apparently no more than was required by the local planning and zoning authorities to make the property acceptable for residential purposes. Considering the evidence as a whole we are satisfied, as previously indicated, that petitioner was not holding the lots in question primarily for sale to customers in the ordinary course of his trade or business. Decision will be entered under Rule 50. Footnotes
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩
2. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *
(b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩
3. In general, practically all business property is excluded from the section 1221↩ definition of capital assets. Section 1231, however, authorizes a taxpayer to treat gains from the sale of business property (other than stock in trade) as capital gain if the property has been held for more than six months. The two sections are to be read in conjunction with one another.