C & A Land Company v. Commissioner.
C & A Land Co. v. Commissioner
Docket No. 1404-69.
United States Tax Court
T.C. Memo 1971-276; 1971 Tax Ct. Memo LEXIS 58; 30 T.C.M. (CCH) 1184; T.C.M. (RIA) 71276; October 28, 1971, Filed. Herbert H. Rosenthal and Bobb Hugo Hardies, for the petitioner. Frank E. Wrenick, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined a deficiency in the Federal income tax of the petitioner for the year ended December 31, 1966, in the amount of $3,498.47. Certain issues have been settled by concession of the parties. The remaining issue is whether gains from sales of real property recognized in 1966 qualify for capital gains treatment under section 1201, I.R.C. 1954. If our conclusion is in the affirmative, petitioner claims additional entitlement to a refund of tax paid for that *59 year in the amount of $3,834.39. Findings of Fact Some of the facts were stipulated; the stipulations of fact and the exhibits attached thereto are incorporated herein by reference. The C & A Land Company, hereafter referred to as C & A or as petitioner, was incorporated pursuant to the laws of the State of Ohio and at the time of the filing of this petition had its principal place of business at Cleveland, Ohio. It filed its Federal income tax return for the year 1966 with the district director of internal revenue at that city. Petitioner was formed on December 4, 1959, with a capitalization of $5,000 evidenced by 100 shares of stock issued to A. A. Treuhaft, hereafter referred to as Treuhaft. The stock was issued in consideration for the transfer of real estate owned by Treuhaft to petitioner. This land was disposed of by petitioner in two separate sales during 1960. Also during 1960, a 3-acre tract of land was purchased by petitioner and leased back to the prior owner on a 5-year lease. This land is still owned by petitioner. At all relevant times, Treuhaft was also a 50-percent owner in the Keyes-Treuhaft Company, hereafter referred to as K-T Co., which was incorporated *60 in 1927 and was in the business of developing residential real estate and home construction. The remaining stock in the K-T Co. was owned by Charles Keyes, hereafter referred to as Keyes. A substantial project of the K-T Co. during the years prior to 1961 was the development of an area in Cleveland, Ohio, called the Landerwood Estate subdivision, 1185 hereafter referred to as Landerwood. Landerwood consisted of several cul-de-sac roadways winding through the area which was divided into approximately 1-acre plots. The plan of the development was to leave no sites vacant and to require that the purchasers of the home sites build houses of a style and value generally conforming to those throughout the Landerwood subdivision. On November 27, 1961, C & A acquired by deed from Treuhaft in a tax-free exchange approximately 37 acres of land contiguous to Landerwood which Treuhaft had owned since July 15, 1949. In exchange for the property, C & A issued to Treuhaft a $16,000 debenture bearing 6 percent interest per annum and due December 31, 1968. The amount of the debenture was equal to Treuhaft's basis in the property. The debenture was paid by C & A together with accrued interest in *61 1969. On November 15, 1961, 12 days prior to the deeding of the 37 acres from Treuhaft to C & A, the directors of C & A acted to authorize C & A officers to "sell the parcel of land * * * purchased from A. A. Treuhaft to the Keyes-Treuhaft Company." The authorizing resolution provided that K-T Co. was to survey and install streets and utilities, the expenditures to be reimbursed by C & A; second, K-T Co. was to complete the purchase of "all lots in the subdivision within five years and not less than ten lots per year after the land is ready for improvement;" third, the price of each lot was to be the fair market value at the time of purchase by K-T Co.; and fourth, K-T Co. was to receive "$1,000 per lot for each lot purchased [by it] as compensation for services in the developing of the subdivision." On January 3, 1962, an agreement was entered into between C & A and K-T Co. which conformed to the above authorization except as follows: in addition to surveying and laying sewers and streets, K-T Co. was to prepare a subdivision plat conforming to the Landerwood standard and gain its approval from the Village of Pepper Pike, Ohio, and K-T Co. was to construct a sewage disposal *62 plant to serve the subdivision and other lands surrounding, these expenses to be reimbursed by C & A; the timing of the required purchases by K-T Co. from petitioner was also modified, the agreement providing that all lots except three to be designated by C & A were to be purchased within 8 years from the contract date and not less than 8 lots were to be purchased per year after the improvements were installed and the subdivision was ready for the construction of houses thereon. However, title to the property with one exception remained with C & A until each lot was sold to the ultimate purchaser, the deed from petitioner to K-T Co. and from K-T Co. to the ultimate purchaser being simultaneous. In accordance with the agreement, improvements were added by K-T Co. which included the development of streets and the installation of water, gas, and sewer plant and lines costing approximately $75,000, and the construction of culverts, landscaping, parks, and miscellaneous improvements costing approximately $21,000. K-T Co. erected a large sign at the edge of the tract, prepared sales brochures, and proceeded to sell the 37-acre tract which had been divided into 31 lots at the following *63 pace: Lots sold by K-T Co. to ultimate transferees
1961
none
1962
none
1963
5
1964
6
1965
5
1966
10
1967
5
When each lot was transferred by K-T Co., C & A received the full sale price minus $1,000, or received the full sale price from K-T Co. and remitted $1,000 to K-T Co. Of the ten sales during 1966 at issue here, only one involved a transfer to K-T Co. without a simultaneous transfer to an ultimate purchaser. In that one instance, the property was transferred to K-T Co. on March 23, 1966, and from K-T Co. to the ultimate purchaser on September 12, 1966. The year at issue is 1966 and the sales here at issue are the 10 lots sold in that year. The improvements allocated to those 10 lots cost approximately $63,400 (which includes approximately $20,000 attributable to the sewage plant) and when added to Treuhaft's cost of $6,000, which was also C & A's original basis, the combined cost plus improvements of the 10 lots was approximately $70,000. The total selling price of the 10 lots was $157,400. Petitioner's other income in 1966 was $414.88 from interest and $500 from rents. Opinion In summary, the facts are that Treuhaft bought 37 acres of land *64 in 1949. From that time through 1966, the year at issue, Treuhaft was a 50-percent owner of a corporation admittedly in the business of developing land, the K-T Co. In 1959, petitioner was incorporated by Treuhaft who received 1186 100 percent of the stock. Petitioner carried out a few investment transactions in real estate during 1959 and 1960. In 1961, the 37 acres were transferred from Treuhaft to petitioner in a tax-free exchange. At the time of the transfer, Treuhaft, acting as sole shareholder and chief officer of petitioner, caused an agreement to be entered into between petitioner and K-T Co. The agreement was assented to by Keyes, the other co-owner of K-T Co. The agreement was that K-T Co. was to develop the land by subdividing it and by installing streets, water and sewer lines, and was to sell the lots to ultimate purchasers. The cost of improvements was to be borne by petitioner and K-T Co. was to receive $1,000 per lot for its efforts. The issue is whether the profits from the sale in 1966 of 10 lots out of the 37-acre tract covered by the 1961 agreement are eligible for capital gain treatment. The controlling statute is section 1221, I.R.C. 1954, [1] which excludes *65 from the definition of capital assets those which are property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The Supreme Court has stated The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. (Commissioner of Internal Revenue v. Gillette Motor Transport, Inc. 364 U.S. 130, 134). A literal reading of the statute is consistent with this legislative purpose. * * * Malat v. Riddell, 383 U.S. 569 (1966). In view of the exception from capital assets of those assets held for sale to customers in the course of a trade or business, it cannot be said that merely a lengthy holding period is sufficient to warrant capital gain treatment. Thus, the search here is for customers and sales in the ordinary *66 course of a trade or business during the year at issue. If found, the conclusion must be that the lots sold in 1966 were not "capital" assets. Petitioner argues that only a single sale was made, one which preceded all improvements, i.e., its 1961 agreement with K-T Co. In viewing the substance of the 1961 agreement between petitioner and K-T Co., we do not view it as a sale of the property at that time for purposes of section 1221. [2] As we view the agreement, it is simply one wherein K-T Co. agreed to sell the lots to third parties for petitioner. The agreement did not represent a completed sale since K-T's promise of future services was without consideration passing to K-T Co. at the time of the agreement (title to the property was not at that time transferred); the price of each lot was to be established on the basis of the fair market value at the time the property was ready for sale to an outside party; and K-T Co.'s compensation was fixed at $1,000 per lot regardless of the extent or success of K-T's efforts. Notably, not even the parties to the agreement called it a sales agreement. The parties are identified in the contract not as seller and buyer but as "owner" and "developer. *67 " The contract's terms are prospective in the sense that K-T Co. "agrees to purchase from the owner [all but three lots of the 37-acre tract] within eight (8) years from the date hereof, at the fair market value * * * at the time the improvements shall be completed." As we view the substance of this agreement, it was not a sale of land from C & A to K-T Co. but rather an agreement by K-T Co. to act as developing and selling agent for C & A. Finding customers, we must now look for sales in the ordinary course of a trade or business. There are no clear markers in that search but the courts have frequently used a battery of indicia. The factors include the purpose or reason for the taxpayer's acquisition of the property and for disposing of it, the continuity of sales or sales-related activity over a period of time, the number and frequency of sales, acquisition of adjacent land, the extent to which the taxpayer or his agents engaged in sales activity *68 by developing or improving the property, soliciting customers and advertising, and the substantiality of the sales when compared to other sources of the taxpayer's income. Ralph J. Oace, 39 T.C. 743 (1963). In this case, the petitioner entered into an arrangement for the future disposition 1187 of the property at the same time the property was acquired from Treuhaft (thus the purpose of acquisition was clearly its disposition); the 10 sales in 1966 fell within a pattern of continuous sales from 1963 through 1967, ranging between 5 and 10 lots each year; substantial development costs were incurred by petitioner through K-T Co., its agent, including parks, streets, and sewage treatment facilities; ultimate buyers were actively solicited by K-T Co. acting as petitioner's sales agent; and the income from the 1966 sales came at a time when petitioner's other gross income was de minimis. All factors thus point to a finding that petitioner was engaged in a trade or business. Where a taxpayer subdivides, spends a substantial sum improving the lots put up for sale, and realizes substantial sums through fairly regular sales, it is exceedingly difficult to escape the inference *69 that the taxpayer has become a dealer in real estate. Gault v. Commissioner, 332 F. 2d 94 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; George W. Longfellow, 31 T.C. 11 (1958). Considering the whole record in light of all relevant tests we find that the property sold in 1966 was held by petitioner primarily for sale to customers in the ordinary course of its trade or business and that its gains therefrom constitute ordinary income. Accordingly, Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 as amended unless noted otherwise.↩
2. It is assumed by both parties that despite the 1961 agreement, the gain from the transfers in 1966 of 10 lots to ultimate purchasers is properly reportable in 1966. See Estate of Clarence W. Ennis, 23 T.C. 799↩ (1955).