**CHANDLER et al.**

v.

**UNITED STATES (two cases).**

**CHANDLER et al.**

v.

**JARECKI, as Collector of Internal Revenue.**

**Nos. 51 C 2025, 51 C 2026, 52 C 1569.**

United States District Court, N. D. Illinois, E. D. June 4, 1954.

Wilson & McIlvaine, Chicago, Ill., for plaintiff.

O. H. Kerner, Jr., U. S. Atty., Chicago, Ill., for defendant.

PERRY, District Judge.

These are three suits, consolidated here for trial seeking to recover for federal income, declared value excess profits and excess profits taxes, for the calendar years 1942 to 1950, both inclusive that the plaintiff alleges were overpaid. The sums claimed together with statutory interest, aggregate in excess of $1,-000,000. This controversy presents the question as to whether the Commissioner of Internal Revenue erred in taxing as ordinary income the gains realized by the taxpayer on sales of certain real estate during the calendar years 1942 to 1950, inclusive. The determination thereof depends upon whether the evidence establishes the taxpayer's contention that the real estate involved was not held for sale to customers in the ordinary course of its trade or business.

The evidence reveals that vast Texas acreage owned by plaintiff was originally conveyed by the State of Texas to the Capitol Freehold Land and Investment Company, Ltd., a British corporation, which had been formed to construct the State Capitol building at Austin, Texas. When the building was finished, the corporation under a license from the State of Texas, entered into the cattle ranching business on a large scale and continued until 1912. In that year it was determined that the ranching business was unprofitable. It was then decided to liquidate the holdings which then had a book value of approximately

$4,700,000. At that time the aggregate land held was about one million acres consisting of ranching and farming land and two town sites. In addition the investment included extensive agricultural improvements.

On June 4, 1915, these holdings were transferred to the taxpayer trust, the declared purpose of which was, in the opinion of the trustees, to liquidate the property by sales, without sacrificing the values. A liquidation date was set for June 4, 1930. Liquidation was not accomplished within that time and the termination date of this trust was extended to June 4, 1935. The world wide depression, adverse weather conditions and other factors proved a serious obstacle to successful liquidation by the amended termination date of June 4, 1935.

Prior to this date, a reorganization proceeding was filed in this Court, and, as a result thereof, the new trust of December 23, 1933 was created. Its declared purpose was the liquidation of the remaining lands. It merely extended the period during which the trust estate was to be liquidated and it made no change in the ownership.

An agreed tabulation from the books and records, or annual reports, of the trustees reflects that from 1915 through 1932 over 700,000 acres of land were sold for approximately $10,747,000; that from 1933 through 1941 over 187,-000 acres were sold at approximately $1,291,000; and that from 1942 through 1950 over 290,000 acres were sold for approximately $5,000,000. During the period from 1942 through 1950 there were at least 536 separate sales transactions, or an average of 59 per year.

The taxpayer trust maintained offices at Dalhart, Texas, and at Farwell, Texas, out of which its representatives contacted prospective purchasers. Originally, a rather large number of commission agents had been employed. In later years, the trust discontinued this method and relied upon a few salaried representatives. The trust maintained an office at Chicago, Illinois, and the record clearly shows that the trustees kept a vigilant eye on every minute phase of the land operation. They approved all sales and leases; fixed all prices for lands; terms of sale or lease; commissions to be allowed; the hiring of employees and agents and their compensation; all advertising and other sales promotional activities; loans; contributions and donations of land to assist tenants or purchasers or for civic needs; improvements; exchanges of land; oil and gas leases and contracts; purchasers of lots; transactions with respect to lands other than those owned by the trust; and miscellaneous expenses.

There was a limited amount of general advertising until the year of 1924. Thereafter, and particularly during the tax years involved, advertisements were limited to annual county fair publications. In 1924, two small hotels were erected by the plaintiff on the acreage to accommodate prospective purchasers, and they were maintained and operated by plaintiff until the mid-1940's. It appears from the taxpayer's tax returns and annual reports that depreciation, a business expense, was shown as a deduction for the two hotels from 1939 through 1945. The returns also reflect depreciation deductions on other improvements and equipment, including automobiles which were apparently used in connection with the automobile and travel sales expense incurred.

Lands, held by the trust, were leased on one year terms for farming or grazing purposes, pending sale. Grazing leases provided for 60 day notice to tenants to vacate in case of sale. Farmer tenants were permitted to remain until they had harvested their crops. During the tax years involved, the rental income was better than 20% of the sales income.

A small townsite at Black, Texas, was laid out in 1925. Six lots were sold prior to February, 1931, and three other lots were given to a church. The remaining lots were turned back into acreage by 1948. There was no surveying of

the properties by the 1915 or the 1933 trusts other than relocating other survey markings that had become obliterated and some resurveying which became necessary from 1915 to the middle twenties in connection with a suit brought by Texas originally in 1908 against the corporation for a return of large acreage claimed to be in excess of the original 3,000,000 acres and erroneously surveyed and transferred to the corporation.

The minutes of the 1915 trust indicate that on April 23, 1924, the trustees authorized one purchase of three lots in the town of Farwell with two buildings thereon for a total price of $1,000. This is the only evidence of any purchase of land by the trust.

The evidence, particularly the minutes of the trust, clearly show that the trust engaged in extensive oil and gas activities. As early as October 15, 1919, the taxpayer entered into a contract with two oil and gas companies whereby large tracts of land were leased to oil and gas companies for the purpose of exploiting the possibility of the presence of gas or oil. As to the parts of the land which would produce, it was provided that the contract would remain in effect "so long as oil or gas in paying quantities shall be found." Theoretically, such lands could remain unsold even to the present day. In 1926, the trustees authorized the opening of an office in Amarillo, Texas, to handle taxpayer's oil business. The minutes present a history of the taxpayer's sale of lands with leases back to the taxpayer and reservation of mineral rights in the land. In 1926, 37,500 acres had been leased for oil development. The taxpayer's representative at Amarillo was authorized to sell leases for a five year period. At this time, the trustees agreed, in principle, upon trading leases in order to extend the area over which they might have a chance of locating oil. In June 1928, the taxpayer held 50 oil leases covering 63,391 acres. In 1930, the trustees agreed that "any large tract which had been reserved for mineral rights should not be sold except with the approval of

the majority of the Sales and Valuation Committee". Between 1937 and 1940, the taxpayer advanced $18,215.43 to finance oil drilling operations. When this particular project was abandoned, the taxpayer claimed a loss, for tax purposes, in the year 1940, amounting to $16,163.51, contending that the loss was from "business expenditures." From 1942 to 1950, oil and gas royalties exceeded $100,000.

The minute book also reflects the promotion by the taxpayer of land sales campaigns and providing prospects with transportation expenses. It financed and operated demonstration and experimental farms; it constructed sample houses.

A so-called "syndicate" consisted of a number of individuals, who had advanced money to the original corporation in connection with its ranching operations, and who obtained a judgment against the taxpayer in a suit for accounting. They accepted land, approximately 17,-300 acres, in partial satisfaction of this judgment. Some of these lands were sold and leased by the taxpayer. By 1933, these lands were reduced to 10,-000 acres, and a trust was made between the interested parties similar to the 1933 trust providing for a liquidation of the remaining lands by sales. The trustees were the same as the trustees of the 1933 trust and the beneficial owners were largely the same as the beneficiaries of the 1933 trust. In 1947, a number of beneficiaries of the taxpayer trust received conveyances of land in exchange for their beneficial interest. The evidence shows that the taxpayer managed and sold lands for both of these groups, which activity was the source of considerable revenue for the taxpayer and was no part of liquidation of the assets of the taxpayer. The trustees and the beneficial owners saw fit to amend the trust indenture in 1947 to authorize the trustees to engage in this activity. In a tax protest filed with the Internal Revenue Department on May 27, 1942, the taxpayer referred to itself as a dealer

in real property with real property as its stock in trade.

The Court has carefully considered all evidence before it and concludes that the taxpayer held the real estate involved for sale to customers in the ordinary course of its trade or business. In reaching this conclusion, the Court has not relied primarily upon any single factor as shown by the evidence. The Court is of the view that under the law it is not proper to dissect the evidence and consider each part individually. The Court has viewed the taxpayer's operation in its totality. Its varied, complex and intricate activities and its method of operation as heretofore outlined, have made it a real estate business and therefore its gains are ordinary gains rather than capital gains.

While this Court has not attached any greater significance or emphasis to the taxpayer's statement in the tax protest, the Court is of the view that it deserves comment. It was advanced in a tax controversy in an effort on the part of the taxpayer to gain a tax advantage. Whether it was correct or not, the taxpayer still saw fit to urge it. The fact also that the Commissioner did not agree with the taxpayer would not foreclose him from later making the determination, as he did in the instant controversy.

The main argument, which is advanced with vigor by the plaintiff, centers about its claim that the taxpayer's activities, throughout its entire existence, constituted an orderly liquidation. Thereby, the plaintiff seeks to bring the entire controversy within the ruling and reasoning of Three States Lumber Co. v. Commissioner, 7 Cir., 158 F.2d 61. It is the view of this Court that the evidence before it does not warrant the application of the legal principle, announced in that case. It cannot accept the plaintiff's position that the taxpayer's activities constituted an orderly liquidation. The evidence indicates otherwise. Liquidation connotes a termination of interest and control, a final disposition of assets. The evidence fails to disclose any consistent plan, which could effectuate such termination or disposition. The operations and actions of the taxpayer lack that finality and conclusiveness of disposition which is normally associated with a liquidation. On the contrary, the evidence tends to show that the taxpayer employed, in practice, a rather flexible arrangement whereby retention of assets could be achieved if it proved profitable. The oil activities of the trust support this point. Had they been successful, the trust very well could still be in control of some of its assets. Furthermore, the management and sale of lands for distributees of the trust by the taxpayer were not consistent with the idea of liquidation.

In its decision, the Court has not been influenced by the vastness of the operation for it would be conceivably possible to liquidate the largest of operations in such a manner as to be entitled to the tax profits under the law of capital gains. Nor has the Court been influenced by the length of time involved in the instant operation because theoretically an orderly liquidation could require an extensive period of time. On the other hand, a vast operation, which involves numerous varied activities as well as tremendous sums of money over a period of several decades, presents factors which are not favorable to or consistent with a definition of orderly liquidation. This, together with the aforementioned facts, confirm this Court's view that the taxpayer is not entitled to the tax benefits under the law of capital gains.

Judgment will be entered for the defendant.