Estate of Josephine Clay Simpson, Deceased Clay Simpson, Executor, et al. [1] v. Commissioner. Estate of Simpson v. Commissioner
Docket Nos. 68633, 68634, 75006.
United States Tax Court
T.C. Memo 1962-71; 1962 Tax Ct. Memo LEXIS 236; 21 T.C.M. (CCH) 371; T.C.M. (RIA) 62071; March 30, 1962
*236 The petitioners and others inherited some 400 acres of farmland near Lexington, Kentucky, in 1930. They were unable to sell this as a unit or in large parcels for a satisfactory price. From 1936 until the taxable years they subdivided parts of the farm from time to time, laid out lots, installed sewers and streets, and made water and utilities available. One of the heirs, as agent for all, gave his attention to arranging for subdividing and maintained an office and telephone listing to receive inquiries and effect sales. In the taxable years 1953 to 1955, 48 lots were sold. The heirs had no intention to go into the real estate business but desired only to liquidate at a fair price. Held, the property was not held by the heirs during 1953, 1954, or 1955 primarily for sale to customers in the ordinary course of any business of theirs. Held further, petitioners Eugene E. and Marguerite G. Simpson are liable for the additions to tax provided by section 291(a), Internal Revenue Code of 1939. Petitioners Eugene E. and Marguerite G. Simpson did not file declarations of estimated tax or pay any estimated taxes for the years 1953, 1954, and 1955. Held, the failure to file declarations *237 of estimated tax in 1953 and 1954 was not due to reasonable cause, and petitioners are liable for the additions to tax provided by section 294(d)(1)(A), Internal Revenue Code of 1939, as to the years 1953 and 1954, and the additions to tax provided by section 6654, Internal Revenue Code of 1954, as to the year 1955. William R. Bagby, Esq., 615 First National Bank Bldg., Lexington, Ky., for the petitioners. Bart A. Brown, Jr., Esq., for the respondent. BRUCE Memorandum *239 Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax for the calendar years 1954 and 1955 of Josephine Clay Simpson in the respective amounts of $4,579.77 and $8,103.95; in income tax of Henry Clay Simpson and Louisiana W. Simpson in the respective amounts of $4,173.76 and $7,736.41; and in income tax of Eugene Erwin Simpson and Marguerite G. Simpson in the respective amounts of $2,500.46 and $6,015.67; and determined additions to tax against Eugene Erwin Simpson and Marguerite G. Simpson under section 291(a), Internal Revenue Code of 1939, in the amount of $940.48 for 1953; under section 294(d)(1)(A) in the amounts of $322.07 and $456.79 for 1953 and 1954, respectively; under section 294(d)(2) in the amounts of $220.86 and $313.23 for 1953 and 1954, respectively; and under section 6654, Internal Revenue Code of 1954, in the amount of $106.93 for 1955. Petitioners Eugene E. and Marguerite G. Simpson claim an overpayment of their income taxes for the year 1953 in the amount of $3,682.60. The parties have, by stipulation, settled certain issues raised by the pleadings in this case. Respondent *240 has conceded on brief that petitioners Eugene E. and Marguerite G. Simpson are not liable for the additions to tax provided by section 294(d)(2), Internal Revenue Code of 1939, for the taxable years 1953 and 1954. The following issues remain for decision: 1. Whether the gains realized by petitioners Eugene E. and Marguerite G. Simpson for the year 1953 and by all of the petitioners for the years 1954 and 1955 from the sale of real estate are taxable as ordinary income or as capital gains. 2. Whether petitioners Eugene E. and Marguerite G. Simpson are liable for additions to tax under the provisions of section 291(a), Internal Revenue Code of 1939, for the year 1953 for failure to file a properly executed return within the time prescribed by law. 3. Whether petitioners Eugene E. and Marguerite G. Simpson are liable for additions to tax under the provisions of sections 294(d)(1)(A), Internal Revenue Code of 1939, for failure to file a declaration of estimated tax for the years 1953 and 1954, and for additions to tax under the provisions of section 6654, Internal Revenue Code of 1954, for the *241 year 1955 for failure to pay estimated tax. Findings of Fact The stipulated facts are so found. Josephine Clay Simpson, a petitioner, died in May 1961, and Clay Simpson is the duly appointed executer of her estate. Josephine was unmarried and resided in Lexington, Kentucky, in the taxable years. Henry Clay Simpson and Louisiana W. Simpson are husband and wife. Eugene E. Simpson and Marguerite G. Simpson are husband and wife. All these petitioners reside in Lexington, Kentucky. Josephine Clay Simpson filed individual Federal income tax returns for the years 1954 and 1955, and Henry Clay and Louisiana W. Simpson and Eugene E. and Marguerite G. Simpson filed joint Federal income tax returns for the years 1954 and 1955. All the returns were filed with the director of internal revenue at Louisville, Kentucky. A Form 1040 in the name of Eugene E. and Marguerite G. Simpson was filed with the director of internal revenue at Louisville, Kentucky, for the year 1953, on February 1, 1954. The form was written in longhand by Eugene. The form was not subscribed by the taxpayers at the bottom of the first page thereof, i.e., following the language, "I declare under the penalties of perjury *242 * * *." A check in the amount of $3,730.86 accompanied this form. Petitioners Eugene E. and Marguerite G. Simpson did not file declarations of estimated tax or make payments of estimated tax for the years 1953, 1954, and 1955. Petitioners Henry Clay Simpson, Eugene E. Simpson and Josephine Clay Simpson, hereinafter referred to individually by their first names or collectively as the Simpsons, are brothers and sister. Josephine was approximately 74 years of age in 1953, and all of her life had been a homemaker. Clay was approximately 57 years of age in 1953 and has been in semi-retirement since 1933 because of tuberculosis contracted then. Eugene was approximately 73 years of age in 1953 and has been a farmer all his life. In 1920, Josephine R. Clay, the grandmother of the Simpsons, died, owning a 417-acre tract of farmland located near Lexington, Kentucky. Part of this tract had been owned by Henry Clay. By her last will and testament, Josephine R. Clay devised the 417-acre tract to her two daughters, Lucretia Simpson and Mary W. Anderson, for life, with remainder in fee upon the death of the last surviving life tenant to the children of her daughters. Lucretia Simpson died in *243 July 1929, survived by her three children, Henry Clay, Eugene E., and Josephine Clay Simpson, who, together with the wives of Eugene E. Simpson and Henry Clay Simpson, are petitioners herein. Mary W. Anderson had two children, Henry Clay Anderson and Matthew W. Anderson. Upon the death of Mary W. Anderson on December 26, 1930, the Simpsons and Henry Clay Anderson and Matthew W. Anderson became the owners in fee of the 417-acre tract. This land had been actively farmed. After the death of Mary W. Anderson in 1930, the profits from farming operations were shared equally by the five heirs. The profits from farming were small in relation to the value of the property. Efforts were made by the five heirs to sell the entire tract. No satisfactory offer to purchase the entire tract was obtained. In 1934 or 1935, two pieces of the property, containing a total of approximately 10 acres, were sold to the Lexington School System. A little later, a lot containing approximately one-half acre was sold to an individual. In about 1936, the five heirs orally agreed to subdivide a portion of the property into lots and sell the lots. Clay Simpson conducted the necessary business relative to such development *244 and sale on behalf of all the heirs and received a commission of 5 percent of the gross sales prices of lots sold. The proceeds from the sales of lots, less specified expenses, were shared equally by the five heirs. During the period 1936 through 1945, Clay consulted with the other heirs with respect to improvements and "asking prices" on various lots. In connection with the management of the development of the tract, Clay rented an office in the Blackstone Building in Lexington, obtained a telephone, hired a stenographer-bookkeeper, and established a bank account under the name "Clay Estate." Since 1936, Clay has held a real estate broker's license. Records were kept and deeds prepared under his supervision. The Blackstone Building was and is owned by the Simpsons. Clay has continued to maintain this office since 1936. Since about 1946, the bank account has been under the name "Simpson Realty Company." Various names have been used by Clay in connection with the development of the tract, including "Clay Simpson, Agent," "Clay Simpson, Official Capacity," and "Clay Simpson." Charges relating to the development have been billed in some instances to "Simpson Realty Company," and in *245 other instances to "Henry Clay Simpson." The 1955 Lexington telephone directory lists the office as "Clay Simpson Realty Company." Each year from 1936 to 1941 a partnership return of income was filed with the collector of internal revenue, district of Kentucky, in the name of "Clay Simpson, Agent for the heirs of Mrs. John M. Clay." Gains from the sale of lots were reported therein as capital gains. Since that time and for each year through 1955, a partnership return has been filed in the name of "Simpson Realty Company." On the partnership returns for the years 1941 through 1953, gains from the sales of lots in Chevy Chase Subdivision were reported as ordinary income. From 1936 through 1945, portions of the 417-acre tract were subdivided into lots and the lots sold. The name "Chevy Chase Subdivision" was given to the developed areas. From 1936 through 1945, 13 different plats of units of Chevy Chase Subdivision were approved by the Lexington-Fayette County City Planning and Zoning Commission. The general method of development was as follows: A small portion of the land was surveyed, improved, subdivided into lots and the lots sold. After the sale of these lots, the proceeds of sale, *246 less expenses, were used to the extent necessary to survey, improve and subdivide another portion. The unused sales proceeds were divided equally among the five heirs. The development involved employing a surveyor for the platting and a contractor for the improvements. These improvements included blacktop street paying, generally curbs and gutters, water mains, sometimes storm sewers, sanitary sewers, and grading when needed. Also, electric and gas lines were made available by the utility companies. In most cases sidewalks were installed but not fire hydrants. Until about 1946, Clay paid the rent for the office the other costs in maintenance of the office, and the salary of the stenographer-bookkeeper out of the 5 percent commission he received. During the period 1936-1945, all of the undeveloped land in the 417-acre tract was farmed. Prior to 1945 the five heirs had, on two occasions, divided among themselves small amounts of acreage in the 417-acre tract. In 1945 or 1946 the remaining undeveloped land in the 417-acre tract was divided among them. To accomplish this, the undeveloped land was surveyed and divided into three parcels. A parcel containing 152.33 acres and representing *247 60 percent in value was received by the Simpsons. The other parcels were transferred to the Anderson heirs. Deeds dated November 23, 1945, and February 14, 1946, were executed by the parties concerned to effect this division. From 1946 through the taxable years, portions of the 152.33-acre tract which was received by the Simpsons have from time to time been developed, subdivided into lots, and the lots sold. The development has continued under the name "Chevy Chase Subdivision" and the manner of development has been similar to that which prevailed prior to 1946. The number of lots in Chevy Chase Subdivision sold, the total sales price of such lots, and the cost of the lots and improvements to the lots sold for each of the years 1936 through 1955 are as follows: Total Cost of
Land and
Lots
Total Sales
Improve-
Year
Sold
Price
ments
1936
13
$ 25,925.00
$13,945.49
1937
60
73,275.00
40,218.48
1938
57
77,115.00
36,341.79
1939
39
48,665.00
23,661.80
1940
29
53,096.00
25,750.58
1941
20
26,491.00
8,334.07
1942
8
10,316.00
3,648.86
1943
20
26,300.00
8,403.96
1944
7
9,342.00
3,211.40
1945
4
6,142.00
949.42
1946
17
29,850.00
12,906.27
1947
18
32,441.00
12,468.00
1948
15
36,302.50
14,668.25
1949
16
46,145.00
18,484.25
1950
37
102,765.50
39,516.00
1951
39
115,353.44
39,520.50
1952
19
63,330.00
17,559.25
1953
13
71,008.62
16,744.00
1954
14
77,962.50
16,179.80
1955
21
109,693.75
25,010.20
*248 The proceeds from the sale of lots after 1945, less all expenses incurred in connection with the development of the property and sale of lots, including compensation for Clay and the office expenses, were shared equally by the Simpsons. During the period 1946 through 1955, 16 plats of units of the Chevy Chase Subdivision were approved by the Planning and Zoning Commission. During the years 1936 through 1955, when land in Lexington, Fayette County, Kentucky, was subdivided, it was mandatory that the plats be approved and that specified improvements be made to the land before the lots were offered for sale. Streets had to meet specifications, as did sidewalks, sewers and drains, and water mains. Most of the lots in the Chevy Chase Subdivision have been sold to home builders usually on terms of 10 percent of the purchase price down with the balance payable within 9 months with no interest on the unpaid balance. The other lots in the subdivision have been sold to individuals. In some instances, notes secured by mortgages on the property sold have been taken by the Simpsons in payment for lots sold to individuals. At various times, Clay, as agent for the Simpsons, has loaned money *249 to contractors who purchased lots in the subdivision to enable them to construct houses on lots purchased, receiving notes for the amount of the loans. The interest rates provided for in the notes received by the Simpsons from purchasers of lots and contractors have been 5 to 6 percent. In 1941 and 1942 Clay, as agent for the heirs, had six houses built on lots in Chevy Chase Subdivision. These houses were built primarily as a convenience to the contractors who constructed them, so that the contractors could keep their building crews employed and intact. In two cases, houses were built on lots which were not saleable otherwise. Profits on the sales of the houses were shared by the heirs and the contractors. During the period 1936 through the present time, Lexington, Kentucky, has been an expanding city. Chevy Chase Subdivision, located on land which was a part of or adjacent to the original Clay estate and near "Ashland," the home of Henry Clay, is among the most desirable properties for residential purposes in the Lexington area. Subdivided, it has been readily saleable. There has been little or no advertising of the lots in Chevy Chase Subdivision. During all of the years here *250 involved, Clay spent approximately two hours a day during the week at the office and approximately 10 to 12 hours a year in making sales of the lots. Usually the lots were sought out by prospective purchasers and Clay was required to exert little effort to sell. No other property was purchased by the Simpsons during the period 1936 through the present time for subdividing or selling. The adjusted gross income of each of the Simpsons, other than income from the sale of lots in Chevy Chase Subdivision, and the income from the sale of lots in Chevy Chase Subdivision, for each of the years in issue, was as follows: Other
Income From
Year
Income
Lot Sales
Josephine
1954
$ 7,264.78
$19,280.88
1955
8,085.38
26,112.51
Clay and Louisi-
ana
1954
$21,933.18
$19,280.88
1955
27,601.40
26,112.51
Eugene and Mar-
guerite
1953
5,048.31
15,402.44
1954
4,066.12
19,280.88
1955
11,926.92
26,112.51
Approximately 80 percent of the income of Eugene and Marguerite Simpson for the years 1953, 1954, and 1955 was derived from sources other than farming. Respondent determined that total gains by petitioners on sales of land *251 in the years noted constituted ordinary income and not capital gains as reported by petitioners. The Simpsons did not hold the subject property primarily for sale to customers in the ordinary course of any business of theirs. Eugene and Marguerite Simpson failed to file a properly executed Federal income tax return for 1953 within the time prescribed by law and such failure was without reasonable cause. They failed to file any declaration of estimated tax for 1953 or 1954 and such failure was without reasonable cause. They filed no declaration and made no payments of estimated tax for 1955. Opinion The Simpson heirs and their cousins inherited a tract of farm land of about 417 acres in 1930. They sought to dispose of this property to their best advantage. When they found themselves unable to get satisfactory offers for purchase of the entire property or large parcels, they resorted to sale of it by lots. Clay Simpson, acting for all the heirs, attended to the subdividing, developing, and selling of portions of the property by lots. In 1945 the heirs arranged a division of the unsold property between the Andersons and the Simpsons. Thereafter, Clay Simpson carried on the liquidation *252 of the part acquired by himself, his brother, and his sister, continuing with the process of subdividing and developing parts of it from time to time to make it saleable. The respondent determined that the petitioners realized ordinary income from the sales of lots in the taxable years, holding that the lots were property held for sale to customers in the course of the business of the Simpson heirs. Section 117, Internal Revenue Code of 1939; section 1221, Internal Revenue Code of 1954. [2] The petitioners contend that their sale of lots was the orderly liquidation of a capital asset, the inherited land, and that they were not in business in selling the lots. Inherited real property, as such, is a capital asset. *253 If it is sold as a unit, any gains realized by the heirs are generally regarded as capital gains. If it becomes necessary to sell in parts in order to realize a better price, that fact alone does not convert the parts into property held for sale to customers in a business of the heirs. Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955); Camp v. Murray, 226 F. 2d 931 (C.A. 4, 1955); Allen Moore, 30 T.C. 1306 (1958). The heirs may engage an agent to develop and sell the property piecemeal, and although the agent is engaged in business, the heirs are not necessarily in business and holding the property for sale to their customers by virtue of the acts of the agent. Estate of William D. Mundy, 36 T.C. 703 (1961); Smith v. Dunn, supra. The problem of whether real estate is held primarily for sale to customers in the ordinary course of business has been considered by the courts on numerous occasions. Criteria have been mentioned in the various opinions which may have weight in resolving the issue in a particular case. Among these have been the purpose or reason for the acquisition of the property; the number, frequency and volume *254 of sales; the extent to which the owner or his agent engaged in sales activities, by developing, improving, and advertising the property; and whether the taxpayer continued to purchase more properties during the period as part of a basic plan of buying and selling real estate. Standards which may be significant in some settings, however, are of little aid in others. No single factor is necessarily controlling and each case turns upon its own facts. The issue here depends upon the intention of the heirs at the time of selling, whether it is to liquidate the property or to engage in the real estate business, using their land as stock held for sale. The heirs originally planned to liquidate. If the heirs changed their intention there must be evidence to show such a change. Their intent is to be deduced from all the facts and circumstances. In cases where it has been held that heirs were holding real property for sale to customers in the ordinary course of their trade or business, the evidence was regarded as showing that the heirs had changed their intention from that of liquidation to that of engaging in the real estate business for profit. *255 Brown v. Commissioner, 143 F. 2d 468 (C.A. 5, 1944), affirming a Memorandum Opinion of this Court; Ehrman v. Commissioner, 120 F. 2d 607 (C.A. 9, 1941), affirming 41 B.T.A. 652 (1940), certiorari denied 314 U.S. 668 (1941). The respondent contends that if a liquidating operation is conducted with the usual attributes of a business accompanied by frequent sales and a continuity of transactions, the operation is then a business and the proceeds of sales are taxable as ordinary income, and that the activities of the heirs in this case in disposing of the property amount to the carrying on of a trade or business. The respondent says that Clay Simpson, by agreement with all the heirs, has handled all the activities relative to development of the property and sale of lots since 1936, conducting the operation for a time as "Clay Estate" and later as "Simpson Realty Company," and that it is of no consequence that the other heirs did not actively participate as his activities are properly attributable to them. The argument is that sales have been frequent, continuous over a long period and in substantial amounts; that development of units *256 prior to sale has been extensive and involved substantial expenditures; that maintaining an office, bookkeeper-stenographer, telephone listing, stationery with letterhead of "Simpson Realty Company," and broker's license all indicate a business operation; that Clay Simpson devoted much time and effort to the development and sale of lots; that partnership returns filed for the heirs listed "subdivision" or "sale of land" as the principal business of the partnership; and that sales promotion activities were extensive. The fact that a liquidation of a capital asset consisting of real property may involve a number of sales of small parcels over a considerable period of time is not conclusive that the owners have changed their intent to that of engaging in business. In Chandler v. United States, 226 F. 2d 403 (C.A. 7, 1955), a corporation was liquidating from 1915 to 1950 its holdings of over a million acres of land and sold over 290,000 acres in the period from 1942 to 1950 in 536 transactions. This was held to warrant capital gains treatment. In *257 Garrett v. United States, 120 F. Supp. 193 (Ct. Cl., 1954), the taxpayers inherited certain beach property, previously divided into lots, and sought to liquidate the property. One of the heirs devoted most of his time to the property and the estate, maintained an office, placed signs on the property, and received fees as executor and commissions on the sale of lots for the benefit of the heirs, proceeds being deposited to the credit of the estate. The liquidation continued from 1925 to 1946. This was held to be a liquidating operation and the proceeds taxable as capital gains. In these cases the intent of the owners to liquidate was deemed established by the evidence. The fact that sales were frequent and continuous is not conclusive that the owners were in a business. Fahs v. Crawford, 161 F. 2d 315 (C.A. 5, 1947); Delsing v. United States, 186 F. 2d 59 (C.A. 5, 1951). It is apparent in the present case that the heirs had no purpose other than an orderly liquidation of the inherited farm land. The growth of the city of Lexington made this land suitable for potential home sites. The heirs had been unable to sell the entire property as a unit *258 and unable to get offers for substantial parts at any price considered reasonable. The possibility of selling a part of it as lots suitable for residence purposes seemed the only practicable way of disposing of their land at its fair value. They did not then foresee the extent or duration of the liquidation. To subdivide and lay out in lots the entire property and install the facilities required by the local government to make it saleable was a large operation and might have overtaxed their resources. Hence, the platting of one small tract at a time and its sale appeared to be a proper step in an orderly liquidation. Josephine was a homemaker and without business experience. Eugene was a farmer. Clay had been in the oil brokerage business, but gave that up on account of his health. He had no prior experience in real estate. He was able to give some of his time to serving as agent for all the heirs in the matter of disposing of the inherited land. He arranged with surveyors to lay out subdivisions from time to time and filed the plats as agent for the owners. He kept an office open for prospective purchasers and placed signs upon the property. He kept the records for the heirs and *259 divided the receipts with them. There was no agreement or arrangement of the heirs at any time to go into the business of developing and selling real estate. Their whole purpose was to liquidate their land at the best possible market. At no time did they alter their intention to do this. The method adopted was practically forced upon them. An office and a telephone listing were necessary in order that buyers might inquire as to prices and terms of sale. Since income was realized from the sales, it was necessary that records be kept of the sales and payments. Since the heirs were equal in interest in the proceeds, except for an agreed amount allowed to Clay for his expenses and services, it was necessary that a return of the income be filed showing the distributive shares of the joint owners. The proper form for this was the partnership return form, which is also to be used for reporting income of a joint venture. The use of the term Simpson Realty Company as a name was a convenient way of listing the telephone and the office at which prospective purchasers might inquire, of maintaining a joint bank account for the heirs, and for reporting income on the returns. It was not intended *260 thereby to assert that the heirs were doing business under that name. The development of subdivisions was not an extensive operation. There was no advertising. Builders asked for lots and bought two or three at a time. No sales effort was necessary. Development included surveying and laying out lots, a certain amount of leveling and clearing of the land, construction of streets, sidewalks, and curbs, installing sewers and water, and making available electric lines and gas lines. This was the minimum development essential to compliance with local ordinances and to make the lots saleable. Clay devoted only a few hours each year to the matter of negotiating sales and only a small part of his time to the other steps. His having a broker's license was a precaution to avoid any violation of local law. The heirs never bought additional land for sale. They bought and operated a farm some eight miles from Lexington, and Josephine and Clay acquired another farm some miles away. Clay made a very few sales of land for other persons as agent in the period 1936 to 1952. Considering all the facts of this case, we have found that the lots sold from the Chevy Chase Subdivision in the taxable *261 years were not property held for sale to customers in a trade or business of the Simpson heirs. Since we conclude that the property here involved was not held primarily for sale to customers in the business of the heirs, it is not necessary to consider whether section 1237 of the Internal Revenue Code of 1954 is applicable. The regulations relating to that section provide that the rules thereof do not apply if without regard to that section the property would not have been considered as held primarily for sale to customers. Income Tax Regs., section 1.1237-1(a)(4)(i). The remaining issues concern additions to tax in the case of Eugene and Marguerite Simpson. Section 51 [3] of the Internal Revenue Code of 1939 requires that each taxpayer file a return made under the penalties of perjury, and provides that a husband and wife may make a single return jointly. Section 291(a) provides for an addition to the tax in case of any failure to make and file a return, unless it is shown that such failure is due to reasonable cause and not to willful neglect. The respondent determined an addition to tax against Eugene and Marguerite Simpson under section 291(a) and contends *262 that the return filed by these petitioners, being unsigned, was not a "return" within the requirements of the statute. Eugene prepared a return for 1953 as a joint return for himself and Marguerite. It was not signed under the wording "I declare under the penalties of perjury that this return (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return." This document was timely filed with a check for the amount of the tax shown thereon as due. It *263 was stamped as "received with remittance" by the district director at Louisville, who accepted the return and the payment. It was intended as a joint return and included all the income of both of these petitioners. No explanation was given by either of them for their failure to sign the return. They contend that Eugene, who prepared the return in his own handwriting and wrote his name in two places on its face, had, in effect signed it. But this was not a signature under penalties of perjury, and there is no showing that Marguerite authorized Eugene to execute the return for her. While the omission of their signatures in the designated place was apparently inadvertent, that fact would not relieve them of the addition to tax. Plunkett v. Commissioner, 118 F. 2d 644, 650 (C.A. 1, 1941). See Roy Dixon, 28 T.C. 338 (1957). There has been no evidence from which we might find that the failure to file a properly signed return was due to reasonable cause. The addition to tax under section 291(a) must be sustained. Respondent has determined that petitioners Eugene E. and Marguerite G. Simpson are liable for the additions to tax provided by section 294(d)(1)(A), Internal Revenue Code *264 of 1939, for the years 1953 and 1954, and section 6654, Internal Revenue Code of 1954, for the year 1955. Section 294(d)(1)(A) provides for additions to tax for failure to file a declaration of estimated tax. Section 6654 provides for additions to tax "in the case of any underpayment of estimated tax by an individual." Petitioners have conceded they did not file declarations for the years 1953, 1954, and 1955 and made no payments of estimated tax in any of those years. They have abandoned their initial contention that Eugene was a farmer for income tax purposes (thus not bound by section 58(a), Internal Revenue Code of 1939, or section 6015, Internal Revenue Code of 1954, provisions requiring the filing of estimated tax returns), and now argue only that the failures to file declarations were due to reasonable cause. "Reasonable cause" will not relieve petitioners from the provisions of section 6654, Internal Revenue Code of 1954. Estate of Barney Ruben, 33 T.C. 1071. Thus, the addition to tax will apply for the year 1955. "Reasonable cause" is a defense to the imposition of *265 the additions provided by section 294(d)(1)(A) of the Internal Revenue Code of 1939. Petitioners have failed to demonstrate, however, that their failures were due to reasonable cause. Eugene testified to the effect that he might have had help from someone at the Lexington Internal Revenue office in preparing some of his returns. This does not show that petitioners reasonably relied upon persons whom they had good cause to believe competent. The petitioners have not shown that their failure to make declarations was due to any cause save negligence or ignorance of the requirements. Neither negligence nor ignorance constitutes "reasonable cause" for failing to file declarations of estimated tax. Howard M. Fischer, 25 T.C. 102. It follows that the additions to tax provided by section 294(d)(1)(A) will apply for the years 1953 and 1954. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Henry Clay Simpson and Louisiana W. Simpson, Docket No. 68634; and Eugene E. Simpson and Marguerite G. Simpson, Docket No. 75006.↩
2. * * * the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; This language is materially unchanged from that which appears in section 117(a), Internal Revenue Code of 1939↩.
3. SEC. 51. INDIVIDUAL RETURNS. (a) Requirement. - Every individual having for the taxable year a gross income of $600 or more shall make a return, which shall contain or be verified by a written declaration that it is made under the penalties of perjury. Such return shall set forth in such cases, and to such extent, and in such detail, as the Commissioner with the approval of the Secretary may by regulations prescribe, the items of gross income and the deductions and credits allowed under this chapter and such other information for the purpose of carrying out the provisions of this chapter as may be prescribed by such regulations.↩